UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| WHIRLPOOL PROPERTIES, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:03-cv-414 |
| | ) | |
| v. | ) | Honorable Joseph G. Scoville |
| | ) | |
| LG ELECTRONICS U.S.A., INC., et al., | ) | |
| | ) | **OPINION** |
| Defendant. | ) | |
| _____ | ) | |

This is an action for trademark infringement and false designation of origin pursuant to the Lanham Act, 15 U.S.C. §§ 1114(a), 1125(a) and unfair competition under Michigan common law.   Plaintiffs seek equitable relief in the form of an injunction and disgorgement of defendants' profits.  The matter is now scheduled for a bifurcated bench trial beginning on April 18, 2006.

On December 21, 2005, the court conducted a lengthy hearing on nine motions and issued seven oral opinions.  The court elected to issue this written opinion on  plaintiffs' motions *in limine* to exclude the testimony of defendants' experts Philip Johnson (docket # 271) and Robert N. Reitter (docket # 275).  Upon review, plaintiffs' motions will be denied.  Plaintiffs' arguments go to the weight rather than the admissibility of this evidence.

**Applicable Standards.**

The trial judge performs a "gatekeeping" function[1] under the Federal Rules of Evidence with regard to proffered expert evidence. The judge must determine whether the evidence is relevant and reliable. *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). However, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. A district court's decision to admit or exclude expert testimony is reviewed under an abuse of discretion standard. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *United States v. Demjanjuk*, 367 F.3d at 633. The district court has "wide latitude" to determine the admissibility of expert testimony, but "its discretion is not unbridled." *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 555 (6th Cir. 2004). "'[T]he same abuse of discretion standard applies to the . . . judge's decisions regarding how to determine the admissibility of the evidence in question." *Barnes v. Kerr Corp.*, 418 F.3d 583, 588 (6th Cir. 2005)(quoting *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir. 2001)). "[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

---

[1]The Sixth Circuit recognizes that the gatekeeping function is less critical in the context of a bench trial. In *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004), the Court of Appeals observed that, "The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." In *United States v. Demjanjuk*, 367 F.3d 623, 634 (6th Cir. 2004), the Sixth Circuit reiterated that "the issue of whether a witness is qualified to testify as an expert is 'left to the sound discretion of the trial judge and particularly so in a bench trial.'" 367 F.3d at 634 (quoting *Can-Am Eng'g Co. v. Henderson Glass, Inc.*, 814 F.2d 253, 255 (6th Cir. 1987)). Assuming *arguendo* that plaintiffs had a right to a jury trial, the court's decision denying plaintiffs' motions would remain unaltered.

In *Daubert*, the Supreme Court held that  the standard for admissibility of scientific expert testimony under Rule 702 of the Federal Rules of Evidence.  509 U.S. at 589-902; *see Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907 (6th Cir. 2004).  The Supreme Court identified a non-exhaustive list of four factors to assist courts in determining whether an expert's reasoning or methodology is scientifically valid or reliable:  (1)  whether the theory or methodology has been or can be tested; (2) whether it has been subjected to peer review; (3) whether it has a known or potential rate of error; and (4) whether is has been generally accepted within the scientific community.  509 U.S. at 593-94,

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that the gatekeeping function under Rule 702 applies to all expert testimony, regardless of the basis of the expert's knowledge.  *Kumho*, 526 U.S. at 147-49.  The Court described the objective of gatekeeping in these terms:

> [T]his is not to deny the importance of *Daubert's* gatekeeping requirement.  The objective of that requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

526 U.S. at 152.  Thus, regardless of the type of expert testimony at issue, the court must ensure that the expert's testimony is both "reliable and relevant." *Id.* at 149.

Rule 702 of the Federal Rules of Evidence was amended in 2000 to embody *Daubert* and *Kumho* principles and now states as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

"*Daubert* ma[de] clear that the factors that it mentions do *not* constitute a 'definitive checklist or test.'" *Khumo*, 526 U.S. at 150. "A district court does not err in failing to mention the *Daubert* factors when they are not pertinent to assessing the reliability of a particular expert." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, (6th Cir. 2004)("[F]or example, an accurate assessment of a local real-estate market does not require peer review or extensive scholarly writing."); *see First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334-35 (6th Cir. 2001); *see also Lake Mich. Contractors, Inc v. Manitowoc Co.*, 225 F. Supp. 2d 791, 795 (W.D. Mich. 2002). However, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146.

## Discussion

### I.    Survey Evidence in Trademark Cases

Survey evidence is frequently utilized in trademark litigation. The Federal Judicial Center's Reference Guide on Survey Research describes the use of surveys in the trademark infringement as "routine." *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, within the *Reference Manual on Scientific Evidence*, 235 (2d ed. Fed. Judicial Ctr. 2000). Admissibility is dependent on the qualifications of the witness, the helpfulness of the testimony to the trier of fact, and the reliability and fit of the testimony. "The reliability and 'fit' of the survey

witness's testimony, in turn, depend on the reliability and trustworthiness of the survey itself."  4 WEINSTEIN'S FEDERAL EVIDENCE § 702.06[3] at 702-136, 137.  Methodological deficiencies in a survey generally relate to the weight to be given the survey's conclusions rather than to its admissibility.  *See Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)("Challenges to survey methodology go to the weight of a given survey, not its admissibility."); *E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992); *Brunswick Corp v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987).  "In an extreme case, an improperly conducted survey with slanted questions or serious methodological defects may be excludable as "irrelevant" of the true state of mind of potential purchasers.  But the majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence."  5 McCarthy § 32:170 at 32-276.  Even assuming an error in methodology, "errors in methodology [] properly go to the weight of the evidence -- subject, of course to Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing."  *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 228 (2d Cir. 1999); *see Bacardi Co., Ltd. v. New York Lighter Co., Inc.*, No. 97-CV-7140 JS VVP, 2000 WL 298915 (E.D.N.Y. 2000).  Survey evidence that is so flawed that it renders the results unreliable must be excluded.  *See Spraying Sys. Co. v. Delavan, Inc.* 975 F.2d 387, 394 (7th Cir. 1992); *Universal Studios Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984).  "A survey need not be perfectly conducted for testimony concerning its results to be admissible.  So long as the expert's testimony and the underlying survey have probative value after all the survey's deficiencies are taken into account, testimony concerning the results of the survey that meets the basic requirements of usefulness and reliability is admissible into evidence, and the trier of fact may accord it the weight it deems proper."  4 Weinstein § 702.06[3] at 702-140.  "While there will be

occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare . . . ." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993).

## II.     Absence of Contrary Survey Evidence From Plaintiffs' Expert

Plaintiffs' motions *in limine* rely on the declarations of plaintiffs' expert, Dr. Sandra R. Cogan.  Dr. Cogan's opinions in her declarations are generally not supported by citation to authorities relied on by survey experts.[2]  (docket # 272, Ex. C; docket # 276, Ex. C).  Dr. Cogan has not offered any survey results of her own in support of the opinions she expresses in her declarations. This is despite her claimed expertise in "the design and implementation of trademark, design patent, unfair competition, right of publicity, and other consumer surveys." (Cogan Decl. ¶¶ 1, 2, docket # 272, Ex. C).  She has designed and supervised the implementation of over 500 surveys, including over 150 trademark, design patent and unfair competition surveys.  (*Id.* ¶ 5).  She has been retained as an expert witness for litigation regarding surveys over 150 times, and has "testified as an expert at trial in Federal Court in thirteen cases in which [she] had[d] conducted surveys for trademark cases . . . ."  (*Id.* ¶ 9).  Here, Dr. Cogan was not retained by plaintiffs to conduct a survey, but only "to review and offer an opinion" regarding a survey conducted by defendants' expert Philip Johnson (*Id.* ¶ 11) and "to review and offer and opinion" regarding a survey conducted by defendants' expert Robert Reitter (docket # 276, Ex. C, Cogan Decl. ¶ 11).  Although plaintiffs' approach of limiting their expert's assignment in this fashion is not unusual, *see* 5 McCarthy § 32:158 at 32-258.1, the absence of competing survey evidence from Dr. Cogan showing divergent survey results

_____

[2] Paragraph 27 of Dr. Cogan's declaration regarding Reitter's survey is an exception to this rule.  (docket # 276, Ex. C, ¶ 27).

significantly undermines the efficacy of plaintiffs' arguments that defendants' evidence is so unreliable that it must be excluded. In other words, plaintiffs' criticisms of the methodology used by the defense experts would have been substantially aided by proof that the "correct" methodology would have led to a different result.

## III.   Qualifications

The qualifications of the three survey experts are not challenged. The parties have favored the court with citations to cases where their expert's work has been cited persuasive, and other cases where the opponents' expert's work has been criticized.[3]   Given the significant

_____

[3] The work of plaintiffs' expert, Dr. Cogan, was criticized in the following cases: *YKK Corp. v. Jungwoo Zipper Co.*, 213 F. Supp. 2d 1195, 1204 (C.D. Cal. 2002)(criticizing Cogan's survey report as "inexplicably ignor[ing]" a whole category of survey respondents who were unsure whether two marks were affiliated, but denying a motion to exclude her report because the deficiencies in her survey went to weight rather than admissibility); *Avent Am., Inc. v. Playtex Prods., Inc.*, 1999 U.S. Dist. LEXIS 1571, at * 30-31 (N.D. Ill. Feb. 10, 1999)("Although Ms. Cogan appeared knowledgeable, her survey methodology leaves quite a bit to be desired."); *Winchester Media Co. v. PRL USA Holdings, Inc.*, 103 F. Supp. 2d 935, 968 (S.D. Tex. 1999)("Because of the many concerns raised by Dr. Cogan's survey procedure, this court credits instead the findings in Mr. McCullough's survey evidence, which shows a confusion rate of 31%."); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1133-35 (N.D. Cal. 1998) (stating that Cogan's survey contained a number of questions that "circuit courts ha[d] found to be inherently leading or biased, and therefore entitled to little, if any weight," but denying a motion to exclude Cogan's survey because the survey flaws went to weight rather than admissibility); *Guess? Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1283 (C.D. Cal. 1997)(describing Cogan's survey as "probably not statistically sound"); *DCNL, Inc. v. Almar Sales Co.*, 1997 U.S. Dist. LEXIS 22931, at * 36-37 (N.D. Cal. Dec. 22, 1997)(criticizing Cogan's survey as "not particularly probative of the likelihood of confusion . . . .").

The work of defendants' expert, Mr. Johnson, was criticized in *Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, No. 95-CIV7686(CHS), 1997 WL 543086, at * 3-6 (S.D.N.Y. Dec. 16, 1997)(finding that although there were significant flaws in the survey's universe, the defects went to weight rather than admissibility). Johnson's work was found to be persuasive in *McDonald's Corp. v. Druck & Gerner, DDS, P.C.*, 814 F. Supp. 1127, 1134 (S.D.N.Y. 1993)("The court rejects Defendant's bases for disallowing the survey evidence, and credits the survey evidence."); *Gateway, Inc. v. Companion Prods., Inc.*, No. 01-4096-KES, 2003 WL 22508907, at * 1419-1420 (D.S.D. Aug. 19, 2003)(discussing Johnson's qualifications, the survey conducted on Gateway's behalf regarding confusion among customers as to the source of CPI's product, and

experience level of all three survey experts, the fact that their work has been criticized in some cases and lauded in others is not surprising.   Criticisms or praise regarding surveys in other cases is not a basis for exclusion.  The court's gatekeeping inquiry must be "tied to the facts of a particular case." *Kumho*, 526 U.S. at 150, 152.  The motions before the court must be judged on their own merits and on the record before this court.

## IV.   Philip Johnson

Plaintiffs argue that Johnson's testimony is unreliable and irrelevant to the issues to be tried, would not assist the trier of fact, and its probative value is substantially outweighed by the danger of unfair prejudice.  (docket # 271 at 1).  The court is not persuaded by any of plaintiffs' arguments.  The court finds that Johnson's anticipated testimony is relevant to the issues of likelihood of confusion and fair use, would assist the trier of fact, and under Rule 403 of the Federal Rules of Evidence its probative value is not substantially outweighed by any danger of unfair prejudice.

Plaintiffs contend that Johnson's survey is not sufficiently reliable because it contains the following defects: an overbroad universe of respondents, improper sampling, use of leading

---

finding that the survey qualified as a "reliable reproduction of prospective consumer reaction"), *aff'd* 384 F.3d 503 (8th Cir. 2004); and *Computer Assocs. Int'l v. AJV Computerized Data Mgmt., Inc.*, 889 F. Supp. 630, 634 (E.D.N.Y. 1995)(court finding Johnson's survey evidence "both reliable and credible.").

Defendants' expert Mr. Reitter had his work criticized and excluded in *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 118-21 (3d Cir. 2004)(district court did not abuse its discretion excluding Reitter survey).  However, in *Bacardi & Co. v. New York Lighter Co.*, No. 97-cv-7140 JS WP, 2000 WL 298915, at * 5 (E.D.N.Y. Mar. 15, 2000), court found that criticisms of Mr. Reitter's survey went to the "weight of such evidence, not to its admissibility," and Reitter's methodology was found to be "more sound" than that of a competing survey in *Pilot Corp. of Am. v. Fisher-Price, Inc.*, 344 F. Supp. 2d 349, 359 (D. Conn. 2004).

-8-

questions, "lumping" responses in a manner that favors defendants, and failing to recreate actual market conditions.  (Plf. Brief at 4, docket # 272).  These purported defects provide plaintiffs with areas for cross-examination of Johnson at trial, but individually and collectively fail to provide a basis for exclusion.

A.      Universe of Respondents and Sample

"The first step in designing a survey is to determine the relevant universe to be studied.  The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case."  5 McCarthy § 32:159 at 32-258.2; *see Reference Guide on Survey Research*, at 239-40.  "Once the universe is selected, a sample to be surveyed is selected from that universe."  5 McCarthy § 32:159 at 32-258.2.  "[A] 'survey' involves taking a 'sample' by selecting some subset of the universe, and questioning persons in that subset."  *Id.*  "Selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility."  *Id.* at 5 McCarthy § 32:162 at 32-258.13.   Where a party surveys a slightly broader universe than would be the perfect target group, it merely goes to the weight given the survey results, not to the very admissibility of the survey.  *See Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930-31 (7th Cir. 1984).  "Even if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which it is intended."[4]  5 McCarthy § 32:162 at 32-258.13.  Occasionally an irrelevant universe of respondents is surveyed.  A survey providing information about a wholly irrelevant universe of respondents is

_____

[4]Rule 703 of the Federal Rules of Evidence "permits an expert (such as a professional taker of opinion and consumer reaction surveys) to form an opinion based on facts or data which are not admissible in evidence if the facts or data are of a type reasonably relied upon by experts in the field in forming opinions."  5 McCarthy § 32:169 at 32-272.

irrelevant.  *Id.*; *see also J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 368-69 (D. N.J. 2002).

The universe Philip Johnson selected for his survey was limited to individuals 18 years of age or older.  The respondent was required to be the person in the household most responsible for decisions about purchasing major home appliances.  The universe was limited to individuals who had purchased a new washer or dryer for their home in the past 2 years or intended to purchase a new washer or dryer in the next 2 years.  (Johnson Decl. ¶¶ 5, 8, docket 272, Ex. A at 4-6).

Plaintiffs' expert, Dr. Cogan, characterizes the universe Johnson selected and his sampling from it as "questionable."  (docket # 272, Ex. C, ¶ 17).  In somewhat hyperbolic terms, plaintiffs' brief transforms "questionable" into an argument that Johnson's universe was "fatally flawed" and "hopelessly broad" and compounded by his "improper sampling."  (docket # 271 at 4-8).  Plaintiffs' expert  believes that the two-year periods selected by Johnson were too long.  She believes that, "A more recent past time frame such as three months would have been more appropriate.  For those currently in the market for a new washer or dryer, he should have asked if potential respondents were currently shopping for these appliances."  (*Id.*).   None of Dr. Cogan's criticisms is supported by reference to written authority in the area of survey research or objective evidence.

Dr. Cogan also suggests additional screening questions that she believes Johnson should have asked.  She believes that questions should have been added to determine if the potential respondents were serious shoppers for laundry equipment such as, "had they looked at advertising for laundry equipment or had they actually shopped for laundry equipment."  (Cogan Decl. ¶ 18).

-10-

She criticizes Johnson for not including screening questions about price points. (*Id.*). She believes that screening questions should have been asked "about whether potential respondents had previously purchased higher priced, higher quality home appliances such as KitchenAid or were 'home enthusiasts' who spend time and effort on creating the perfect home." (*Id.* ¶ 19). She states without any supporting evidence that, "These are the types of consumers who would be more likely to be knowledgeable about KitchenAid's Whisper Quiet mark because this is the type of equipment they purchase." (*Id.*). Again, her opinions are devoid of reference to supporting authorities. Although both KitchenAid and LG tend to promote their laundry appliances at the higher end of the market, there is no evidence before the court that a discrete and identifiable class of "consumers of higher price appliances" exists. Dr. Cogan did not conduct any survey demonstrating that her suggested modifications to Johnson's survey would produce different or more accurate results. In essence, she is claiming that she could have conducted a more accurate survey but did not do so. There is no evidence before the court demonstrating any inaccuracy Johnson's survey, much less sufficiently serious defects that would render the results unreliable and require exclusion.

2.    Leading Questions and "Lumped" Results

Plaintiffs argue that Johnson's testimony should be excluded because his survey contained leading questions and that Johnson improperly "lumped" survey results. (Plaintiffs' Brief at 8-9, docket # 272). "In an extreme case, an improperly conducted survey with slanted questions or serious methodological defects may be excludable as 'irrelevant' of the true state of mind of potential purchasers. But the majority rule is that while technical deficiencies can reduce a survey's

weight, they will not prevent the survey from being admitted into evidence.  This is especially true in a non-jury case."  5 McCarthy § 32:170 at 32-276.

Johnson states that he was retained to design and conduct a survey to determine "how the words  'Whisper Quiet,' as used by LG on panels of its home laundry products, are perceived by purchasers and prospective purchasers."  (Johnson Decl. ¶ 4, docket # 272, Ex. A at 2).  He sought to test whether the words "Whisper Quiet," as used by LG, "are believed by consumers to be a trademark or indicator of source, or conversely, whether these words are believed by consumers to merely serve a functional purpose, *e.g.*, indicating the sound level of LG's appliances when operating."  (*Id.*).  Johnson's method for conducting interviews and the questions posed to respondents are discussed in paragraph 9 of Johnson's Declaration. (Johnson Decl. ¶ 4, docket # 272, Ex. A at 7-8).

Dr. Cogan states that interviewers provided respondents with a "poor quality" photo of an LG washer or dryer.  (Cogan Decl. ¶ 20, docket # 272, Ex. C).  She criticizes Johnson for failure to analyze the respondents' answers to an initial question asking, "Feel free to comment on anything that strikes you about this [photograph], either positively or negatively."  (*Id.* ¶ 21).  Dr. Cogan provides no explanation how these purported deficiencies render Johnson's survey unreliable.

Question 2a of Johnson's survey had the interviewer point to the bottom line of a photograph, where it said "Whisper Quiet" or alternatively "Quiet Operation."  The respondent was then asked, "Now, looking at this picture of just the side of the control panel, if you were in a store shopping for an appliance and you saw this washer [dryer] with the words, "Whisper Quiet [Quiet Operation] on it, would this tell you anything about the washer [dryer]."  (Johnson Decl., ¶ 9).  Dr. Cogan states, that "there was no reason to preface 'Whisper Quiet' with 'the words,' or with

-12-

anything at all." (Cogan Decl. ¶ 23). She states that, "This proves that the respondents could hear, see, read, and ultimately come to a conclusion about what 'Whisper Quiet' means because it includes the word quiet." (*Id.*). Dr. Cogan's criticisms are captious and unpersuasive. If Dr. Cogan had conducted a similar survey omitting the purportedly offending phrase "the words," and achieved significantly different results, her criticism might be more persuasive. As it is, there is no evidence that if the challenged phrase had been omitted that the survey results would have been any different.

Question 3a of Johnson's survey asked, "Do you believe that a washer [dryer] that uses these words, 'Whisper Quiet [Quiet Operation],' comes from, is associated with, or is put out by one company only? or More than one company?" Dr. Cogan again objects to "these words" appearing in Johnson's question. (Cogan Decl. ¶ 24). Dr. Cogan states that she finds the question to be confusing. She states that asking this question with the LG brand name on the depicted washer or dryer panel is not accepted survey methodology and that in a secondary meaning survey, the mark must be shown on the product with all brand names (indicia of origin) redacted. (*Id.*). There is no legal or professional survey authority cited for these propositions. Dr. Cogan states that the answers to this question reflect "brand awareness" rather than "source identification":

> [K]eep in mind that the survey respondent has first looked at a poor quality photo of full view of an LG washer or dryer, which is a relatively unknown brand with low market share and that the LG equipment looks nothing like a KitchenAid washer or dryer.[5] The respondent is now looking at the control panel of the LG washer or dryer and also has been asked if the words "Whisper Quiet" would tell him or her anything about the equipment and if so, what it would tell them. Now the respondent is supposed to somehow understand and answer this strange "source identification" question. The answers reflect brand awareness more than anything else."

---

[5] The declaration of plaintiffs' expert that LG's washers and dryers "look[] nothing like a KitchenAid washer or dryer" and "LG clothes washers and dryers and their control panels [] look very different from KitchenAid laundry equipment" (Cogan Decl. ¶¶ 24, 25) is probative on the issue of likelihood of confusion and is not helpful to plaintiffs.

(Cogan Decl. ¶ 24).  Plaintiff's criticisms go to the weight of the evidence, not its admissibility.

       3.   <u>Marketplace Conditions</u>

       Finally, plaintiffs argue that Johnson's survey did not adequately represent market conditions.  (Plaintiffs' Brief at 9, docket # 272).  Generally, the closer the survey methods mirror marketplace conditions, the greater the evidentiary weight of the survey results.  *See*  McCarthy § 32:163 at 32-260; *see also Jordache Enterprises, Inc v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487-88 (10th Cir. 1987); *ConAgra, Inc. v. Geo A. Hormel & Co.*, 784 F. Supp. 700, 734 (D. Nev. 1992).  Dr. Cogan's declaration states that the visual stimuli shown to respondents was not representative of what the consumer sees in the marketplace.  Specifically, she declares, "Respondents saw only LG clothes washers and dryers and their control panels which look very different from KitchenAid laundry equipment.  They never saw any KitchenAid laundry equipment with its Whisper Quiet mark.  The photos were of poor quality with glaring reflections making it difficult to read the names clearly."  (Cogan Decl. ¶ 25, docket # 272, Ex. C).  Dr. Cogan has presented no evidence that a different result would occur if better quality photographs with less "glaring reflections" had been utilized, or if respondents had also been shown KitchenAid control panels.  Again, her criticisms go to the weight and not admissibility.

       The court finds that the anticipated testimony from Philip Johnson is sufficiently reliable and relevant to pass the gatekeeping test under *Daubert* and *Kumho* and Rules 702 and 403 of the Federal Rules of Evidence.  Plaintiffs' motion will be denied.

## V.      Robert Reitter

Plaintiffs' motion *in limine* with regard to defendant's expert Robert Reitter asks the court to exclude his testimony on the grounds that his survey method was improper because he failed to follow the *Ever-Ready*[6] format, involved a flawed universe and sample, skewed geography and age demographics, failed to screen for "actual or serious" potential purchasers (Plaintiffs' Brief at 3-9, docket # 276), and should be excluded under Rule 403 of the Federal Rules of Evidence (*Id.* at 9). None of these arguments provide a basis for exclusion.

Plaintiffs' initial argument is that Reitter's survey attempted to assess "confusion and awareness components" and that "in attempting to be an impossible hybrid of both, in the end, it becomes neither." (Plaintiffs' Brief at 4, docket # 276). Exhibit A attached to plaintiffs' brief is a copy of Reitter's survey report, entitled "Study Among Consumers of the Source-Related Significance of 'Whisper Quiet' in Connection with Major Home Appliances." (docket # 276, Ex. A). When asked at his deposition what he meant by the phrase "source related implications," Mr. Reitter responded as follows:

> A.      I meant it to include the possibility of a likelihood of confusion, and therefore, to cover that inquiry within the study as well as the final inquiry having to do with consumer awareness of Whisper Quiet as having come from KitchenAid or Whirlpool, so it's a, an expression that I came up with that simultaneously covered the confusion and awareness components of the survey.

(Reitter Dep. at 134, docket # 276, Ex. B). Whether the defendants' use of Whisper Quiet creates a likelihood of confusion for consumers and whether consumers perceive Whisper Quiet as a designation of origin are obviously relevant issues. *See* 15 U.S.C. §§ 1114(1), 1125(a)(1), 1127. The essence of trademark is a designation in the form of a distinguishing name, symbol or device

---

[6] *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976).

used to identify a person's goods and distinguish them from the goods of another." *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

Plaintiffs are correct that Reitter's survey does not precisely follow the survey format utilized by Union Carbide's expert in *Ever-Ready*.[7]  In *Ever-Ready*, Union Carbide Corporation, the holder of the registered trademark "EVEREADY" for electric batteries, flashlights and miniature bulbs for automobile and marine use, brought an infringement action against Ever-Ready Incorporated, an importer of miniature lamp bulbs and high intensity lamps.  A district court found no likelihood of confusion and did not credit Union Carbide's survey evidence.  The Seventh Circuit reversed, finding that the district court's findings were clearly erroneous.  531 F.3d at 387-88.  Union Carbide's expert conducted a lamp survey in which a picture of an Ever-Ready lamp was shown to each respondent.  The respondents were then asked three questions:

1.     Who do you think puts out the lamp shown here?

2.     What makes you think so?

3.     Please name any other products put out by the same concern which puts out the lamp shown here?

Only 0.6% of the respondents answered Union Carbide to question 1.  However, in question three, 55.2% indicated Union Carbide by identifying Union Carbide products, such as batteries, having been put out by the same concern.  The Seventh Circuit found this to be compelling evidence of confusion:

_____

[7] "A now-standard survey format used to prove likelihood of confusion in cases where plaintiff makes some products which defendant does not is the *Eveready* format."  5 McCarthy § 32:174 at 32-290, 291.

-16-

We do, however, hold the district court clearly erroneous in not crediting the surveys taken by Carbide. That the first questions alone do not show likelihood of confusion is insignificant. They only show that the interviewees do not associate the Ever-Ready name with Carbide. The test, as discussed *supra*, is whether they associate the products either with Carbide or with the single, though anonymous, source, which manufactures EVEREADY products. Those who indicated that they believed other Carbide products were manufactured by the same company that produced the bulbs or lamps shown must be considered cases of confusion.

531 F.3d at 387.

Respondents in Reitter's test group were shown a photograph of the control panel of an LG clothes dryer (docket # 276, Ex. A, Appendix F). "Below the LG logo, the following phrases appeared:

Ultra Capacity

Stainless Steel Drum

Sense Dry

Whisper Quiet

Next to the photograph was placed another, an enlargement of the section showing the LG logo and the phrases below it." (*Id.*, Ex. A at 11, and Appendix F). Reitter showed respondents in a separate control group two similar photographs where Quiet Operation appears instead of Whisper Quiet. (*Id.*, Appendix G). The photographs remained in view of the respondents for the duration of the questioning. The respondents were told to look at the photographs of the clothes dryers as they would if they were in a store considering whether or not to purchase this particular dryer (*Id.* at 12), then they were asked the following series of questions:

1.     Who do you think produces or manufactures this dryer?

2.     What makes you think so? Anything else?

-17-

3a.     Do you think that the company that produces or manufactures this dryer is connected or affiliated with any other company?

If "yes":

3b.     What company?

3c.     What makes you think so?  Anything else?

4a.     Do you think that the company that produces or manufactures this dryer got authorization, that is, permission from any other company to do so?

If "yes":

4b.     From what other company do you think it got authorization, that is, permission?

4c.     What makes you think so?  Anything else?

Interviewers pointed to "Whisper Quiet" for the test group and "Quiet Operation" for the control group and then asked:

5a.     Have you seen or heard this exact phrase Whisper Quiet, [Quiet Operation for the control group] used in connection with home appliances before?

If "yes":

5b      What company has used this exact phrase in connection with home appliances?

(docket # 276, Ex. A at 12, 13, and Appendix B).  Mr Reitter was asked during his deposition whether his study tested "what happens in the marketplace when someone sees the LG panel with Whisper Quiet and then later in the day or the next week sees KitchenAid's panel with Whisper Quiet on it or vice-versa?"  He gave the following response:

A.      It doesn't.  The study design, the *Eveready* design depends for its proper functioning on what's already in the person's mind when you show them in this case the LG dryer with Whisper Quiet on it.

So to the extent that they have previously seen KitchenAid washers or dryers with Whisper Quiet and we now show them an LG dryer with Whisper Quiet, to that

-18-

extent, that past experience is reflected in people's answers, but I didn't recreate the experience with them in the confines of the research study.

I allowed that to have happened as it has, as it did.

(docket # 276, Ex. B at 176).   The aspect of *Ever-Ready* that Reitter was focusing on in his deposition was the fact that, as in *Ever-Ready*, the survey respondents were only shown pictures of the defendants' product, not pictures of plaintiffs' products.

Plaintiffs misleadingly cite the case of  *Simon Prop. Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 149 (S.D. Ind. 2000), for the proposition that, "the *Ever-Ready* format is only appropriate in situations, unlike the present case, where 'consumers . . . are *not* likely to encounter the two trademarks together.'" (Plaintiffs' Brief at 4, docket # 276)(emphasis supplied by plaintiff). The *MySimon* case does not stand for this  proposition, and the partial quote appearing in plaintiffs' brief is misleading.  The full quote from the opinion in context is set forth in italics below:

> SPG's experts have opined that a survey in the *Eveready* format would not be appropriate for this case.  In the *Eveready* format, derived from the infringement of the "Eveready" trademark on batteries in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 385-86, a consumer would be exposed to only my Simon's mark, home page, or other stimulus, and would then be asked "Who do you think puts out this service?  What makes you think so? Name any other product or products put out by the same concern that puts out this service. *See* 531 F.2d at 385.  The respondent would not be shown the SPG Mark in such a survey. *This format is obviously well-suited to determine whether one trademark will confuse consumers who are not likely to encounter the two trademarks together.  See e.g., AHP Subsidiary*, 1 F.3d at 613-14, 618 (district court erred by failing to give sufficient weight to the results of *Eveready* survey in which about 38% of respondents who viewed defendant's mark thought they had seen plaintiff's product).[8]

---

[8] Plaintiffs attorneys were apparently hoping to avoid drawing the court's attention to the Seventh Circuit's *AHP* decision cited at the end of the full quotation.  In *AHP*, the Seventh Circuit found that the district court had improperly rejected survey evidence.  The Seventh Circuit found that, "While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare and the present case is not among them.  We believe that any shortcomings of the survey results go to the proper weight of the survey and should be evaluated by the trier of fact." *AHP*, 1 F.3d at 618 (citations

104 F. Supp. 2d at 1049-50.  The court's statement that a format is "well suited" to a particular situation is certainly not the equivalent of holding that the format is "only appropriate in" that situation.

In the same vein,[9] plaintiffs cite the district court's decision in *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291 (S.D.N.Y. 2001), as the basis for the following argument: "As in *Trouble*, the Reiter survey utterly failed to test for confusion at all, and should be excluded on this basis under Rule 702."  (Plaintiffs' Brief at 6, docket # 276).  The district court in *Trouble v. Wet Seal* expressly excluded the survey evidence on the basis of Rule 403, not Rule 702: "Given the lack of a proper universe and sample, the poor choice and location, the lack of proper stimuli, and questions that have little or no relevance to issues in the case, the Court finds that the prejudicial effect of Wet Seal's survey substantially outweighs its probative value."  179 F. Supp. 2d at 308 (citing FED. R. EVID. 403).[10]  The quoted excerpts in plaintiffs' brief from the *Wet Seal* decision are misleadingly selective.  (*See* Plf. Brief at 5).  The italicized text appears in plaintiff's brief and the bold text is conspicuously absent:

> The questions in the surveys included questions such as, "Do you think that 'Arden B.' clothing is made and sold by a company that makes and sells any other line of clothing?" and *"Do you think that the company that makes and sells 'Arden B.' clothing is affiliated,*

omitted).

[9] Plaintiffs' resort to citing cases for propositions for which they do not stand and misleading use of partial quotes will not be tolerated.  This only serves to undermine the court's confidence in plaintiffs' arguments and creates work for the court in policing counsel's citations. Plaintiffs' attorneys will be sanctioned if this conduct is repeated.

[10] The court is aware that in the next sentence, the *Wet Seal* court stated, "[T]he survey results and any opinion evidence based on them are inadmissible.  *See* FED. R. EVID. 703."  179 F. Supp. 2d at 308.  Even assuming that the court had intended to cite Rule 702, its approach was backwards because the Rule 702 inquiry necessarily precedes Rule 403 balancing.

*associated, or connected with any other women's clothing company?"* Rather than test a consumer's confusion, these question[s] test their *awareness of other lines of clothing and company affiliation.* **If an interviewee spontaneously answered 'Agnès b.' to the second question, there would be some evidence of confusion.** But *contrary to the assertions of the survey's author*, Mr. Ridgeway, *the fact that the majority of the interviewees answered 'no' to the* second *question does little to establish that they would not be confused if they encountered both marks. See* Dep. of Joseph M. Ridgeway, Sr., dated April 11, 2001, at 45 ("I chose those questions as a means of identifying the likelihood of confusion between the two names.").

179 F. Supp. 2d at 308 n.12.

        Plaintiffs argue that Reitter's survey is fatally flawed because the third question he asked was: "Do you think that the company that produces or manufactures this dryer is connected or affiliated with any other company?" rather than asking the respondent whether he or she could name any other *products* "put out by the same concern which put out the [defendant's] product shown here." (Plf. Brief at 4). The Seventh Circuit's 30-year-old *Ever-Ready* decision did not establish a survey template that must be followed in every case. The issue before this court is whether a respondent who has viewed the defendants' dryer console with "Whisper Quiet" on it and is asked, "Do you think that the company that produces or manufactures this dryer is connected or affiliated with any other company?" provides sufficiently reliable and relevant information to pass the gatekeeping threshold. The court finds that it does. Plaintiffs' arguments to the contrary go to the weight of this evidence and provide areas for plaintiffs to explore in Reitter's cross-examination.

        Plaintiffs again rely on a declaration by their expert Dr. Cogan in support of arguments that Reitter's survey is not reliable because his universe and sample are flawed, the survey's age demographics (over-representation of young consumers), and geography (over-sampling of the South and under-sampling of the Northeast and Midwest) are skewed, the screening for actual or serious potential purchasers was inadequate, and that the survey failed to adequately reflect market

conditions.  (Plf. Brief at 6-9; Cogan Decl. ¶¶ 17-34).  The court finds that these arguments, closely related to the those previously addressed at length with regard to Johnson, do not warrant separate discussion and clearly go to the weight of Reitter's testimony rather than its admissibility.  Likewise, the court finds no basis for exclusion of Reitter's anticipated testimony under Rule 403 of the Federal Rules of Evidence.

## **<u>Conclusion</u>**

For the reasons set forth herein, plaintiffs' motions *in limine* (docket #'s 271, 275) will be denied.


Dated:   January 10, 2006            <u>/s/  Joseph G. Scoville                              </u>
                                     United States Magistrate Judge